Obes, which the insurance companies have managed to make the plaintiff and the defendant come in arm-in-arm, and so that's good work. Okay, Mr. O'Connor. May it please the Court, good morning, Your Honors. I'll first try to address the questions that the panel posed regarding the justiciability of the issue of duty to indemnify. Frankly, we do think that the Louisiana Direct Action Statute is controlling of that analysis and does indeed establish that these issues are justiciable or right. Okay, what about the cases in Louisiana saying that they're not? I think two things on that. address the issue of duty to indemnify, which we're, by the way, not asking this Court to decide at this juncture. We're simply saying that the district court's decision saying there isn't a duty to indemnify because there is no finding of coverage, that that is an erroneous decision. So it's not that you're making the decision on the… No, but, I mean, by arguing the merits of that decision, you're saying it's justiciable, and justiciability to me is a question of subject matter jurisdiction, and we don't give advisory opinions as Texas doesn't and Louisiana doesn't, and the whole argument is we don't know what's going to be proven at trial, but it's possible – your argument, I think, is it's possible we could prove loss of use of tangible property, injury, physical injury to tangible property, and therefore, since we don't know what's going to be proven, we shouldn't decide that now. I'm surprised you're saying, yeah, we should because you were on the losing end of the yeah, we should thus far. Well, I don't – I guess I don't view it as an issue of ripeness or justiciability, as you put it. I have more trouble with that word. I think, again, Louisiana – because Louisiana, unlike Texas, gives the party the opportunity to directly sue the insured, that that issue is right. Okay, is there a – because I was interested in that, but when I looked at all the Louisiana cases, they sounded like the Texas cases on this. So the direct action simply means that everybody's going to be in the same lawsuit, and it's all going to be resolved in the same lawsuit. It doesn't mean necessarily that you can decide an issue – that a particular issue is ripe at a particular stage in the game. I mean, for example, in Texas, you file a declaratory judgment action as an insurance company and say I don't owe coverage and I don't owe a defense, and the court says, well, I can decide the defense now. I'm going to have to wait on the indemnity, and that's how that lawsuit goes. So nobody's upset that you filed the case, but it just doesn't get determined until the underlying liability case is done. So I don't – I asked the question about direct action because I wasn't sure, but I didn't find anything that suggests that makes a difference to that analysis, but maybe you did. Did you find a piece of it? Well, I'm not aware of a specific case that addresses the exact question that you asked. I'm not aware that it's come up in Louisiana because you do have the right of direct action. And in this instance, the district court dismissed all the claims. It dismissed the insured's claims both for indemnity and defense, and it dismissed Solstice's claims for coverage. So I think in that instance, the court necessarily, in my opinion, has to reach the question of defense. I didn't see the duty to defend disgust at all other than Seneca saying we're not in bad faith because we offered a defense under reservation of rights. And I have to tell you, I did insurance work granted in Texas for many, many years, and I wouldn't let a client defend under reservation of rights if there's absolutely no way they could ever owe coverage under the eight corners of the petition and the policy. The proper thing to do there is deny it. Reservation of rights is when, well, maybe this, maybe that, we don't know, we don't know, we don't know, so we're going to come in with all these disclaimers and defend, and that's what happened here. I didn't see that the duty to defend was litigated at all. I guess two points. I think that question may be better put to counsel for the insurers. Let me maybe address the analysis under Texas law, not that I'm a Texas lawyer, but if I appreciate it, the exception to the Texas general rule that you shouldn't reach the issue of duty to identify is that if the basis for denying the defense and the indemnity are one and the same, then you can't do that. And I think given the way the district court approached the issues here, we would fall under those exceptions if we were governed by Texas law. I don't think there's any question that, first of all, nobody challenged our right to use the direct action statute here. I don't think there's any issue there. I also, you know, the Supreme Court and the Louisiana Supreme Court have validated the direct action statutes. I don't think there's any suggestion that this is an improper vehicle by which we got to this point. I do think that the district court conflated the analysis, and I don't think any issue was brought up that maybe, and again, maybe it's for. Really, if I could sum up, because I do want you to get to the merits of the argument. You got our letter, and you concluded, well, there's a direct action statute that must cover this, and that was the extent of your research in response to the court's letter. Because you haven't cited a case to me or said anything that is in any way responsive to the letter other than, well, I think because there's a direct action, that must be that. I mean, does that sum up what you did? No. I think two things. First of all, I have cited the direct action statute, and the U.S. Supreme Court in Watson v. Employers Liability has determined that that statute is constitutional. Second, I've assessed the Texas cases that were cited in the letter and believe under the circumstances of the case presented here that if Texas law were applicable, which we don't think it is to the issue, but if it were, it would fall within the exception to the general rule because the basis on which the district court decided the issues, indemnity and defense, were based on the same exact circumstances and facts. That would be my response. I didn't see an eight-corners analysis, but I'll go back and look again at the district court's analysis. It looked like an analysis of the evidence and affidavits and people saying what happened to the well, which is not a due-to-defend analysis, which is an eight-corners analysis under Texas law. But you only have five minutes. Tell us what you want us to know about whether the well bore was damaged and so on. In getting to that issue, the district court, in our view, improperly and too narrowly framed the question. It seems to have construed our allegations and our evidence merely supporting the proposition that the well didn't reach the targeted bottom hole location. That's not the case. Certainly we did say the well didn't reach the bottom hole location, but the court didn't then look at, well, what were the reasons that the well didn't reach the targeted bottom hole location? And that's where certainly we take the position that the well bore was physically damaged and that that is physical injury to tangible property as it's defined in the policies that we're dealing with. The evidence, put differently, we think the court asked this question. We said, does failing to reach the bottom hole location in drilling a well equate to physical injury to tangible property? And he said no to that. And that may be the right answer, but he stopped there. And instead he didn't ask, is the reason that the well didn't get to the bottom hole location because it was damaged, because it was damaged to such a point that it couldn't continue to be drilled for that purpose to get to the targeted bottom hole location. Okay, point us to the evidence where experts said or lay people, knowledgeable lay people, said there was actual damage as opposed to all this junk about the zigzagging and everything like that. I mean, point me to your, let's put it this way, point me to your best evidence that you think creates the fact question that you're arguing to. I think the best evidence is reflected, among other ways, in the surveys in the record that show, illustrate the well path. In Mr. Dirks' testimony that the well was so contorted, and again, Mr. Dirks is representative of the drilling engineers, so that's part of his job. He says the well was so contorted, we had so much drag, we were bending this thing around corners and up and down. That's not what you want to have happen when you're drilling the well, of course. Mr. Griffin, our engineering expert, said there was repeated rubbing at a dog leg that creates worn spots called key seats. This occurs in the casing. It's a situation where the key seats weaken the casing, make it either impossible or very difficult to get the drill pipe through. It causes situations where the pipe is stuck. So is the casing itself the property that's injured? In part, certainly. I think, and if we get to the exceptions, I certainly think the underground resources and equipment coverage endorsement of Seneca's policy, which we think is picked up also by the C&I policy, covers not just damage to the casing but the entire well core, and of course that's what we say was rendered useless or beyond ability to use to continue drilling that well. Mr. Stevenson also testified that the problem was not able to be corrected. If you recall from the briefs, Your Honor, the well got down to about 9,400 feet, and it was determined to be well off course, and there were efforts to correct it. And those efforts went on for weeks, and they were unable to correct that issue. It seemed like what happened was it simply exacerbated the situation. Not only was the well not going back towards the direction that it could have, that's where the zigzagging came in, and at the end, when it was determined that it was no longer feasible to continue drilling that well, the direction in which it was going was completely opposite to where it had been represented to be going. We think that the district court, in relying on the PPI case, misunderstood or took that case beyond its logical extension. The PPI case involved a well drilled on the wrong lease. It wasn't a situation where the well that was drilled was damaged, and the plaintiff in that case never alleged any other damage to property. Similarly, the court relied on – I may pronounce this wrong – but the Kamele case, and the Kamele case involved a well that crossed a lease line. In each situation, the well that was drilled, there was no allegation that there was damage to the well. The basis for the property damage asserted in those cases was, one, in Kamele constructive eviction, which we don't have here, and in PPI, there was no damage because the well that was drilled on the wrong lease was plugged and abandoned. The only thing – Okay. All right, Mr. Conner, you've saved time for rebuttal. Thank you. Appreciate it. Thank you. Mr. Hanna, I know you have limited time. Do you want to add anything to the justiciability? Do you have a different view on the justiciability issue or greater research or scholarship than we've had the opportunity to hear yet? What I would say is that when you look at the claims that were made by Holbrook in their cross-claim against the insurers, we saw not only the defense but indemnity. And the motion for summary judgment addressed all the claims that were brought in the cross-claim, and we believe that the judge addressed all claims via the motion for summary judgment, whether defense and indemnity. We treated the arguments as intertwined, if you will, on defense and indemnity. I understand the eight corners analysis. Certainly the same in Louisiana. I understand the ultimate facts. It wasn't done here, was it, the eight corners analysis? Well, but there was so much factual information that was presented in the motion for summary judgment that if there was a finding of no coverage, then there is ostensibly no duty to defend. So we addressed – we spent our time addressing the facts as pled on coverage. But certainly we believe that the judge was in error in finding the way that he did on the facts, which would go to both coverage and duty to defend. So if you look at it, in the First Amendment to the complaint, Solstice alleged that Oldbrook caused damage to property owned by Solstice, including without limitation physical injury to the well and integrity of the wellbore. Solstice goes on to allege that Oldbrook's negligence furthermore rendered the well and materials and tools used to drill the well useless. As we stated, such allegations reflect something akin to a constructive eviction, loss of use of the well. Therefore, we addressed not only the allegations that were raised within the complaint of Solstice, but also the facts that were developed during the litigation that went to the coverage issue. And possibly there could have been some division in arguments, but we spent the bulk of our time addressing – So let me come at it this way. Is there going to be anything at trial that's proven that we haven't already heard about? Because the question on justiciability is like what is the trial going to prove? And you guys – and the judge said, well, it's going to prove no property damage. And therefore we can decide that. Now that's the essence of what he said. And the justiciability analysis is like is there no way that you can at trial prove property damage? And I don't see anybody analyzing it that way. Well, certainly there's always a possibility that testimony might come out that's different than what was developed and discovered. I think the judge was premature in deciding summary judgment in this instance. I think there was more than enough factual information that we developed as to the property damage claim, whether you believe it is in fact property damage or not. Of course, we just have to accept the allegations that are made on the complaint and assuming the facts as pled in opposition to motions for summary judgment. The motion for summary judgment clearly was wrong. There was sufficient evidence presented of alleged property damage, both in the testimony of witnesses and the experts and within the confines of the pleadings themselves. Your Honor, there was allegations of a wasted and damaged wellbore. There was testimony regarding a wasted and damaged wellbore. It simply is a situation where there is sufficient information, sufficient evidence before the court to find that there is an issue of material fact. All right, thank you. Mr. Lewis. Good morning, Your Honor. We have actually reserved five for another of the appellees. Raymond Lewis, on behalf of Commerce and Industry, we are the excess carrier. And, Judge, I think there's a couple of issues with respect to the justiciability, and I will probably butcher that word throughout, that I think the court needs a little bit of a background with the procedural posture of this case. Judge Barbier was looking at a complete and final fact record. The discovery cutoff in this case was January 16, 2015. And the summary judgments, which this was a deliberate timing of how the insurers did this and also in working with the other parties through discovery, we filed a summary judgment after the discovery cutoff. So you're saying practically speaking, whatever one could imagine, there just isn't going to be any more facts. Correct. We're done with facts, and so we've got what we've got, so we may as well decide it. That's kind of your justiciability argument in a nutshell. You said it better than I did. All right. Is there any – so I appreciate that, but is there any difference between Louisiana, because of its direct action statute, and Texas on the question of when you decide justiciability, in theory, regardless of this case? I believe there is, although when we got the questions, our first research and position was that a pure Griffin exception, we believe, applies in this case. Griffin is, like you said, it's looking at the Texas dichotomy where you have an underlying tort suit with the alleged victim and the insured, and then you have a declaratory judgment action. Well, that dichotomy doesn't exist under direct action statute, which I'll get to. But under a Griffin exception, pure, if we were in Texas, I think it applies. And if you look at the Fifth Circuit case, the Cook – I call it Cook 2 because we had two of the Cook cases here. And even in Kamali, Evanston, and the LCS corrections, the civil rights case, all of those cases used the Griffin exception because they were looking at the declaratory judgment actions. And they said, well, look, we've got a bunch of exclusions here that make coverage impossible. In this case, a pure Griffin exception would apply because all of the evidence, which everything that could exist, did exist, was in front of this district court. He looked at it and he said there is no coverage under this policy. And I think, again, the duty to defend at that point was a little bit of a foregone conclusion because the defense had been there throughout the entire case. We were actually a couple months from trial before these motions were filed. So in this case, the Griffin exception purely applies. But if we move to the effect of the Louisiana Direct Action Statute, I think the Griffin exception is unquestionably applicable because – Do you have any cases? I mean nobody went out and did research when we got a letter from the court. Yes, Your Honor, I did. There are no cases from the Fifth Circuit in Louisiana that address this specific issue that you're asking. I think what we can do is we can look at the cases again, and they are the Cook, the Connelly, Evanston, and the LCS corrections. The purpose of the Griffin rule is so that the court, in viewing the duty to indemnify, doesn't jump the gun. It doesn't do something without having a factual record. In Louisiana, we don't have that sort of dual competing cases going on. In this case, from day one, the insurers were at the table. Everything was on the table. All discovery was geared towards not only the liability of the insured but also the coverage and whether it existed under these policies. Well, now, wait a minute. Has anybody decided or argued who made the mistake on deciding the direction? I thought the insured was saying that the employee of the other company gave them the lead, which they followed and made the mistake. I thought there was a big argument about whether or not this insured was responsible for the mistake in the direction of drilling. Judge, I believe in the pure liability dispute between Solstice and Oldbrook. Oldbrook intends that it did not do anything wrong. There was a mud weight issue. Obviously, that is removed from the coverage of the issue. I understand, but that's not before us, is it? It is not, sir. No, it is not. Well, but it does say that that would be something that would justify the holding no writings. We can't get – why wouldn't we get the insurance when we haven't decided who's at fault? Well, and again, Your Honor, in this particular case, the question is whether or not property damage existed or a loss of use existed. All of the evidence indicates this is a breach of contract dispute between these two parties. Solstice, they wanted something, and they didn't get it because Oldbrook allegedly drilled it 700 feet in the wrong direction. There is no property damage which would be covered by this policy. Now, there may be other insurance policies out there that Oldbrook didn't acquire, but under the facts of this case, there was no property damage and there was no physical loss of use. And we can even move forward to some of the exclusions if we want to get there. But in this case, the fundamental liability dispute between Solstice and Oldbrook is effectively a breach of contract, a specific performance. Solstice said, I need you using your professional expertise to drill me a well to this point. Allegedly, Oldbrook drilled it in the wrong direction. I understand, but that is the reason for the holding of not rightness. And if that breach of contract dispute in any way could implicate coverage under these policies, there may be a tiny foothold there that obviously was never really developed in the case because they have always been alleging there was property damage. Again, the breach of contract is unquestionably not covered under these policies, and that's why when they first pled the case, Solstice never mentioned property damage because this case has never, ever been about property damage until the insurance companies came in and said, well, look, it's not covered. Well, see, that's my concern is they actually pled themselves into coverage in the first amended complaint, and that's the whole duty to defend analysis. I mean I think if we had done an eight corners, a proper eight corners, we would have found a duty to defend. So that's why I have a problem with saying the Griffin exception applies because the Griffin exception rests on when the same thing, when you basically, like you said, you're never going to convert a drive-by shooting into an auto accident no matter how much you gyrate, and therefore let's not play this game of waiting until this, that, and the other. We're done. But you don't have that here. You look at the eight corners, and it seems rather clear there's a duty to defend, which I think is why Seneca defended. Again, in my experience, insurance companies don't go around spending money they're not required to spend, and they have a duty to their policyholders, other policyholders, not to do that. So they don't just offer defenses for fun. They do it when there's a question. That's why they do the reservation of rights, and that's what happened here. Well, but I think we – you're right from the very beginning of the pleading stage, and had we filed certainly judgments three or four months after they filed an amended petition, maybe that would be the fundamental question for this court. But that's not what happened in this case. What happened is we did discovery for two years. We exchanged multiple expert reports. We deposed countless witnesses, exchanged thousands of pages of paper, and at the end of the day… I mean your argument really is we're at the point of the underlying liability case. I mean, in a way, your argument is really that but for the actual trial, we've done everything else. I don't know that there's… I will mention to you all there's several cases that say Louisiana law generally provides that the underlying issue of liability is resolved, and the defendant's casting that until the underlying issue of liability is resolved, the issue of indemnity is premature and non-justiciable. That's a Fifth Circuit case, 465F Appendix 302, and then a Louisiana Court of Appeal case, Mosse Motors, 898 Southern 2nd, 602. So I'm not sure there's a difference between the two. I think your argument is just procedurally we're at a different place than we typically are in these cases. I think all of the cases that… But then I guess I would ask, well, then why not just to have the trial? Well, I think because it was very clear from the factual record to Judge Barbier, who's a good judge, that there was no true property damage in this case. Again, this case has always been a breach of contract issue. The property damage that they have alleged was sort of an after-the-fact only to trigger coverage. When we got to the end of the road, which was after discovery, that's what the judge… That's 90% of the cases that get defended under a reservation of rights are somebody trying to plead into coverage, and that's totally proper and lawful to do as long as you have a good faith basis to do it in the law and the facts. The plaintiff's lawyer absolutely should do that, frankly, if he or she has a good faith basis in the law and the facts. So I don't understand why the fact that they plead this is a negative and answers the question. I mean the fact that two parties have a contract to me doesn't answer the question of whether there could be property damage. I mean that's a whole line of Lamar Holmes and all of that stuff is that just because somebody's there by contract and not just happened by and caused some harm doesn't answer the question of whether there can be coverage for that. And in this case, like I said, we were at the end of the road. Discovery was complete. Everyone's deposition was set in stone. Their testimony was set in stone, and not a single one of them could identify property damage. In fact, when you asked them, they said, well, I can't contend that. Literally, we asked their Harvard business guy, their director, can you identify what was physically damaged in this well? And his response was, I can't contend that. Okay, so what do you – how do you respond to Dirk and Griffin with the rubbing of the casing and the contorted drag and all of that? If you actually look at their testimony, and it's Record Excerpt 9 is the Griffin affidavit, which, again, we believe and we put it in the briefing as well as improper because it's a post-motion, post-deposition, post-report affidavit that was carefully drafted. But it still doesn't do it because in this case, everything they talk about, these zigzags, the dog legs, the wearing of the case seat, if you look at the last paragraph of his affidavit in Record Excerpt 9, he doesn't ever say that any of the things that are problematic when those things exist, he doesn't ever say they existed in this case. He says this may happen, this could happen, this increases the likelihood of this, but he never says any of those things occurred in this case. And so when the district court receives all of the evidence that is going to come into its record in a few months at the trial, it has everything you could possibly imagine in the underlying suits that's referenced in the cases in Texas. And so it looks at everything and it says under no interpretation of the facts do I find this property damaged and there is no coverage under the policy. Had the – I think the district court got to that conclusion and it realized if there's no coverage, there's no duty to indemnify at that point. There's no duty to defend at that point. And that's where its rulings I think basically took the whole ball of all the claims against the insurers and said you don't pass the threshold issue, we're done. So let me ask you this. What does – and I realize you're the excess, but you're on a follow-up form policy. So what does Seneca's policy cover given what it was Obst was doing? Because you're saying, well, if they had a contract, they go out there, they script the contract, they cause the whole hole to be zigzagged and messed up and casing harmed and all this, too bad. We don't have coverage for that. So then I'm left to wonder what do you have coverage for? Well, and from a first standpoint, I would – I'd have to let Seneca address what's covered under their policy because although we are a slight follow-up form. Well, they gave you the 15 minutes, so that makes me think you've got the bigger stick. That is true. So you've got to answer my question. There's a whole host of things that could be covered under this CGL policy, but it's not a performance bond. It's not a guarantee of their work. Well, and I know, and that actually is the reason for all this whole development of case law over in Texas about Lamar Holmes and all of that. And actually the court never decided which law applies, so I'm not talking out of school by talking about Texas law here. But it's because you have these CGL policies that end up not covering anything because the insurance companies say, oh, we're not a performance bond. Oh, we're not a warranty company, which are the other things that could possibly be in play. And yet you have contractors out there messing things up and causing things to be injured and saying, yes, we are covered under a CGL policy, which is supposed to be comprehensive. But I think that's the critical section of the court's question, causing things to be injured. And in this case, there was nothing that was caused to be injured. And I know they're going to get up and say, well, we had dog legs and zigzags. But when you are directionally drilling a well, you're going from surface to a point that is 12,000 feet and about another 1,000 feet to another direction. So you're literally corkscrewing in some ways this whole well to get where you want to be. So the idea that you have dog legs and zigzags, that's actually required in the directional azimuth changes when you're going down to the desired depth. This is an interesting discussion, but I'm looking at your responsibility. You've said, or Seneca has said, that we will defend. We're not going to get to the coverage question, but we will defend and reserve our rights. And so there, Seneca is defending. Now, they can either argue they've got an exclusion that protects them, no coverage. Or, on the other hand, they've got the merits of who was negligent. Isn't that a problem? Unless you say you take these things at one stage and you decide whether or not you have come to the issue of who was negligent and resolve that before you talk about your exclusions. My time is up. May I respond? Please. I know you're going back over land you think you've covered, but that conflict bothers me. And I understand. And I think the point there, again, is to go back and say all of those cases are trying to prevent when you have a dual case system of an underlying suit and a DJA. But you have cases in Louisiana that say the exact same thing. No, I agree. But all of those cases, even in a direct action statute, where those two are merged together. The entire fundamental purpose of the Griffin rule and the case law is to prevent the court from ruling on the duty to identify until the facts are established. And every single case says that. You've got to wait until the facts are established in the underlying suit before you reach indemnity. In this case, all of the facts, especially the ones applicable to whether coverage was triggered under either Seneca or Commerce and Industries policies, had been established. There was nothing else that – I mean, we've tried cases before on Barbier. If it hadn't come out by January 16, 2015, it wasn't going in that record. And so all of the facts were put in front of him and he made the coverage determination at the time. Now, I do understand that there's still a question of liability between these two. But sadly, it's not covered. We're starting to get afield from Judge Riebley's question, so thank you. Thank you, Your Honor. Ms. Schaub? Good morning. My name is Julie Schaub, and I represent Seneca Insurance Company. As to the ripeness issue, the original complaint alleged breach of contract. Seneca Insurance Company denied coverage outright. The complaint was amended. It tracked the language of the Underground Resources and Equipment Hazard Endorsement. Look at the eight corners. There was a duty to defend. We reserved rights because some things were covered, some things were not covered. At that point, the name of the game is to ask the question at every single deposition, was there damage to the well? Was there damage to the wellbore? Was there damage to casing? Was there damage to any equipment? Was there damage to any resources? In every single deposition, the answer to that question was no. Have all people who are identified as persons with knowledge of relevant facts been deposed? Discovery deadline is complete. That wasn't my question. My question is whether everybody who was disclosed as a person with knowledge of relevant facts has been deposed. I believe so. Okay. Because the argument is nothing can happen in trial that we don't know about, but if you had ten witnesses listed and eight of them were deposed, those other two guys, and I've had that experience as a lawyer and a judge, where one of those other two guys comes in and says a case-breaking headline and nobody deposed them, so then that would not be inconsistent with the discovery deadline and all that to bring in that witness. So that's why I'm asking, because it seems like your co-counsel or Mr. Lewis is resting on the notion that there just isn't a shred of evidence out there that can come up at trial that we haven't heard. That we are aware of. And before the motions for summary judgment were filed, if this was going to trial, the same questions would be asked at trial, but there were no material issues of fact and dispute on the facts underlying the coverage issue, so we filed our motions for summary judgment. And that's where we stand. So basically the answer to your question is when you have a duty to defend, and some things are covered and some things are not, yes, there has to be an evaluation of the facts in the liability proceedings, but what's different about Louisiana is there's no underlying action. It's all the same. Well, then how do you answer these cases like Mossie Motors that says duty to indemnify is premature and the New England case that it's premature until the defendant is cast in judgment? I mean, how do you answer that? It seemed to me, let me just put it this way, and I don't purport to be an expert on Louisiana insurance law, although I've had to become one over time, it seems to me Louisiana isn't different than Texas on this point, on this point of prematurity. But that's why we sent the letter, so you all would go out and do research and bring us cases, which I have yet to hear one, other than that it's not unconstitutional to have a direct action statute, that answers the question we asked. I believe that the reason why I couldn't find any case law on it is because that's just the way it's done in Louisiana. It's coverage and liability, it's all in the same action because of the direct action statute, so there's no underlying action that you have to wait for the resolution of. As to whether something needs to go to judgment, whether there can be a determination on indemnity, I believe that that is not the law in Louisiana. There can be a judgment on indemnity once there's a development of the facts and the facts are understood. Okay, you know what I'm going to do, because I just don't decide cases based on, well, everybody knows this. I decide cases based on statute and case law and authorities, and I think my colleagues do as well. So I'm going to give everybody until Monday at 5 o'clock, June 13, to file letter briefs on this subject of justiciability, both in response to the letter that was sent out last week, as well as to the cases that I cited today, as well as to what everybody knows in Louisiana about direct action, actually finding cases or even a treatise that would address this would be helpful, because I'm sorry I can't just go on what you think. Now, I've made a big speech and took some of your time, so I'll give you a few extra seconds if you need them. As to what is covered and what is not covered under the Seneca policy, physical damage to property, underground resources, all the property that I enumerated earlier, damage to that property is covered. What is not covered is the cost to repair or replace the insured's defective work, which would be the cost to re-drill the well. But isn't there a fact question about what it is exactly OABS did? This is Judge Riebley's point. What it is OABS did that caused this so-called defective work? In other words, whether they themselves were doing the work or they were directing the work or their ideas were the reason for the work, it's a little bit confusing to me. I don't understand that they were holding the thing that went wrong. I thought they were telling the people what to do. Is that not correct? I believe that OBES was the directional driller and had a subcontractor working with them. Okay. Right, so, okay. Counsel, let me ask you. You represent Seneca. When Seneca appears in this case, does Seneca come again saying only we rely on the exclusion? And since there was no damage and loss of use of property, this coverage would not apply. And is that what they're saying? Or do they come in saying we are reserving rights but we'll file in defense of the self-insured? Based on the allegations contained in the amended complaint, Seneca provided a defense pursuant to a reservation of rights to deny coverage should it be shown that there was no damage to any property, any underground property or resources. We also reserve the right to deny coverage under certain specific exclusions, such as the exclusion which provides that Seneca will not— but the exclusion of the policy. You don't say anything about the negligence or causation of solstice? No, Your Honor, not in the reservation of rights. We just set forth our coverage defenses. Well, you're not appealing to defend. You're not defending their liability. Seneca—I represent Seneca on insurance coverage issues. Seneca hired a separate attorney to provide a defense to the insured. Is anything said in your pleading, in your appearance, about anything except that Mino Alamo? No, because the damage is excluded. Whoever caused it? Yes, it doesn't matter who caused the physical damage. That's what you said? I don't think I said that in the reservation of rights. All right. That's enough. Thank you very much. Thank you. A lot of fun. I gave the cites to the cases that I mentioned, which were New England Barnett, 465F Appendix 302, and Mosse, 898-7-602. My colleague also had another case that wanted me to mention, 267F-2-601, the Westport case. As well, there's a cite in the original letter to you all that came from the clerk's office, LCS 800F-3-664. These are dealing with Louisiana law. Of course, there's legions of Texas law cases as well. All right. We have still the rebuttal of Mr. O'Connor. Did I give you any help? Way in the back. I think you may have, yes, Your Honor. You can't tell. I think one thing that has me maybe viewing this differently than Judge Haynes and others is that because the district judge's findings of no property damage and apparently no plausible way of showing property damage at trial was part and parcel of his dismissal of all of the claims against the insurers and the counterclaims by the insured against its insurers, that to me signals that to address the court's judgment, it's necessary to look at the question of property, whether there could have been property damage under the facts as alleged and the evidence. I mean what's interesting is your opponent concedes a duty to defend, didn't move for summary judgment on duty to defend, so any judgment on duty to defend would be unsupported by any request for the hat. And now you're coming in and saying, yes, the judge did decide duty to defend against us, despite not looking at the eight corners, which your opponent concedes if you do, there is a duty to defend. And you're saying that it is justiciable, even though you're saying there have to show no plausible basis for liability at trial, and we don't know that. So I'm thoroughly confused, to be quite honest, as to who represents whom here, because people seem to be making the arguments that I would expect them to be making. But you've got to decide your case as you see appropriate. I think the district judge perhaps improperly dealt with the duty to identify and duty to defend as if it were one and the same because of the way he reached his conclusion. All right, I've given you – let me say this. Physical damage to the well. Mr. O'Connor, I've given you all until Monday to actually do – maybe just having you all appear at oral argument to argue wasn't helpful from a disciplinary standpoint. I don't mean discipline like I'm disciplining you, but discipline of writing makes a difference in thinking. So maybe the discipline of having to write something will help you all analyze this. And I'm not going to hold you to saying it is justiciable. If you go and find cases that say it's not, you can confess error on that and say so. And, of course, same for the opposing side has to come in and tell us what they find. So I'll leave that on that. If you want to make any other arguments on the merits to address the exchange between Judge Ribley and counsel opposite. Further on the merits, pointing to the underground resources and equipment coverage endorsement in the Seneca policy. That endorsement covers damage to the, quote, well bore, equipment in the well casing. We've all along asserted that the damage caused by Oldbrook's actions so compromised the well, the well bore, the casing inside of the well bore that it, at a certain point, was determined it had no further utility. We believe that that endorsement provides the coverage and to read any of the exclusions as undercutting that endorsement makes the coverage be swallowed by the inclusion. I think Judge Hanger, the one you recognize, that for Oldbrook as a directional driller, all of their work relates to stuff going on down hole in the well. This is the tension in all of these. It's really a breach of contract, but really what do we pay for a CGL policy for cases, which is why we have such a long series of this stuff in Texas and keeps a lot of construction and insurance lawyers employed in Texas. It's, of course, a lovely thing. All right. Thank you. We appreciate y'all's arguments and we'll look forward to your letter briefs and we're going to take a 10 minute recess.